## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

               **Case Nos. 1:08-cr-2**

      **v.**                   **1:18-cv-889**

**MARY C. ROGERS,**            **JUDGE DOUGLAS R. COLE**

        **Defendant.**

---

**MARY C. ROGERS,**

        **Plaintiff,**

               **Case No. 1:18-cv-825**

      **v.**                 **JUDGE DOUGLAS R. COLE**

**NATIONAL CITY BANK, et al.,**

        **Defendants.**

### OPINION AND ORDER

These three cases—a criminal case and two related civil cases—have a long and convoluted history. But the simple version is this: In 2008, Mary Rogers pleaded guilty before Judge Beckwith to bank fraud for her role in arranging a $4,000,000 loan from National City Bank to an entity controlled by her co-conspirators. (One co-conspirator went to trial and was convicted.) Rogers has long since served her twenty-four-month sentence and completed her term of supervised release, but she remains subject to a restitution obligation. Rogers now contends that new "evidence" shows the bank never advanced the funds at issue, thereby rendering her conviction wrongful. Based on that allegation, she sought post-conviction relief in her criminal

matter. When she filed a motion to vacate the criminal judgment, that resulted in the Clerk's Office opening a civil case for statistical purposes (Case No. 1:18-cv-889). And the final case (Case No. 1:18-cv-825) arose because of her efforts to obtain discovery in support of her claim about the lack of evidence. All three cases ultimately landed in the lap of Judge Dlott, who denied Rogers all relief.

Rogers then submitted a motion styled as a petition for a writ of mandamus, which was filed in each case. There, she claims that Judge Dlott is biased and should have recused herself rather than adjudicating Rogers' cases. She also reiterates her argument that the criminal conviction was invalid because the alleged $4 million loan never occurred. Judge Dlott has recused from the matters, which resulted in the cases' reassignment to the undersigned.

Now, having reviewed Rogers' "evidence" relating to her conviction, the Court concludes that her challenge to its validity is both untimely and spurious. And because that is the case, Rogers' claims that Judge Dlott was biased against her are irrelevant (in addition to being meritless). Accordingly, as detailed below, the Court **DENIES** Rogers' Petition for Writ of Mandamus in each of the three cases (Doc. 109; Case No. 1:18-cv-825, Doc. 22; Case No. 1:18-cv-889, Doc. 5).[1]

## BACKGROUND

The facts underlying Rogers' criminal conviction, as reported in the Statement of Facts attached to her Plea Agreement (Doc. 2), are straightforward. Rogers was

---

[1] Unless otherwise specified, docket citations refer to documents filed in the criminal case, whose docket number is 1:08-cr-2.

the Butler County Auditor from 1995–2008, which position involved overseeing Butler County's Fiber Optics Project. (*Id.* at #18–19). In that role, she falsely represented to National City Bank that her co-conspirators were authorized to act on behalf of Butler County. (*Id.* at #19). She also knowingly signed three documents used to further the conspiracy—two "Master Certificates of Incumbency" and one "Resolution"—on behalf of Butler County without the proper signing authority. (*Id.* at #19–20). Her misrepresentations induced National City Bank to advance Rogers' co-conspirators $4,000,000 to which they were not entitled. (*Id.* at #20). National City Bank was unable to recover that money. (*Id.*). Separately, Rogers filed a federal tax return that did not declare income she received for tax preparation and accounting services. (*Id.* at #20–21).

Those simple facts have since spawned a convoluted procedural history spanning multiple cases. On February 4, 2008, Rogers pleaded guilty in the underlying criminal case to one count of Conspiracy to Commit Bank and Mail Fraud, in violation of 18 U.S.C. § 1349, and one count of Filing a False Tax Return, in violation of 26 U.S.C. § 7206.[2] (Doc. 2, #7 (plea agreement listing the counts to which Rogers pleaded guilty); Doc. 10 (minute entry for plea hearing)). In the statement of facts attached to her Plea Agreement (which Rogers signed and to which she admitted), Rogers concedes that she, acting in concert with certain "co-conspirators," fraudulently arranged for National City Bank to "advance[] $4,000,000 to [a company

---

[2] Technically speaking, the Internal Revenue Code as compiled in Title 26 of the United States Code has not been enacted into positive law. But Rogers' plea agreement refers to the charge as arising under 26 U.S.C. § 7206(1). (Doc. 2, #7). So the Court will do the same here.

referred to by the moniker] DC."[3] (Doc. 2, #19–20). Based on her plea, Judge Beckwith, the then-presiding judge, convicted Rogers and sentenced her to 24 months imprisonment (24 months on each count, to run concurrently), followed by 5 years of supervised release (5 years of supervised release on Count 1 and 1 year of the same on Count 2, to run concurrently); $4,000,000 in restitution; and a $200 assessment. (Doc. 41 (minute entry for sentencing hearing); Doc. 42 (judgment); Doc. 45 (amended judgment)).

A flurry of motions regarding Rogers' sentence and restitution obligations has followed over the years. About six months after the Court entered judgment, it granted the government's Application for a Writ of Garnishment (Doc. 47). (Order, Doc. 48). Rogers filed a belated opposition, (Doc. 52), the government replied, (Doc. 56), and the parties settled that dispute by way of an Agreed Order, (Doc. 60). The Court then denied Rogers' Motion for Modification of Sentence (Doc. 61), in which Rogers sought an early release from prison to home confinement. (*See* Doc. 62). And shortly after her release from prison, the Court ordered her to commence minimum monthly payments ($10.00 per month) directed toward her restitution and assessment obligations, as a condition of her supervised release. (Doc. 63). Following that, the Court denied, (*see* Doc. 69), Rogers' motion for early termination of

---

[3] "DC" stands for Dynus Corporation—an entity majority owned by Orlando Carter, one of Rogers' co-conspirators. (Doc. 76-1, #437 ("Carter was the majority owner of Dynus Corporation. At trial, the government asserted … [that] Carter and others failed to disclose financial information to auditors, including (1) a guaranty to return $4 million to National City Bank … and (2) National City Bank's demand for the return of the $4 million[.]"); *see* Doc. 91, #621 ("In her capacity as Butler County Auditor, Rogers signed fraudulent documents to assist co-conspirator Orlando Carter, the majority owner of Dynus Corporation ('DC'), in committing bank fraud.")).

supervised release (Doc. 67). After the case was reassigned to Judge Barrett, (Doc. 70), Rogers renewed her request for early termination, (Doc. 71), but the Court again denied it, (Doc. 72).

Rogers then opened a civil case (1:18-cv-825) by filing a pleading she labeled a "Complaint for Restraining Order, Preliminary Injunction, Declaratory Judgment, Fraud, Emotional Distress, Conspiracy/Other Tortious Conduct" against National City Bank, whose successor in interest is PNC Bank (PNC).[4] (Case No. 1:18-cv-825, Doc. 1). There, she alleges for the first time that the bank made up the $4,000,000 debt and provided fraudulent information to the Department of Justice, which then conspired with bank officials to prosecute her. (*Id.* at #2–3 ("Based on fraudulent information provided to USDOJ officials by PNC Bank regarding the purported $4,000,000, Rogers was charged with conspiracy to commit bank fraud … . Simply put, Rogers went to prison based on a $4,000,000 lie told and concealed by PNC Bank executives, USDOJ officials and other co-conspirators.")). After this civil case was reassigned to Judge Dlott, (Case No. 1:18-cv-825, Doc. 6), Rogers sought a temporary restraining order and preliminary injunction against PNC Bank. (Case No. 1:18-cv-825, Doc. 8). The same day, based on the allegation that no $4,000,000 debt existed, she also moved to vacate the judgment in the criminal case under 28 U.S.C. § 2255. (Doc. 73).

Next, PNC Bank moved to dismiss the claims against it in case 1:18-cv-825. (Case No. 1:18-cv-825, Doc. 13). And roughly one week later, Rogers moved to

---

[4] Rogers brought the case against both National City Bank, now known as PNC Financial Services Group, Inc., and PNC Bank, N.A.

supplement her § 2255 motion in the underlying criminal case, (Doc. 75), which the Court (through Judge Barrett, the then-assigned judge) granted, (3/22/19 Not. Order).

In support of her new claim that no debt existed, Rogers also sought to subpoena documents from the United States Probation Office and from PNC Bank. The Court, acting through then-Chief Judge Sargus, quashed the former. (Doc. 80-1). And PNC Bank then filed a motion to quash Rogers' subpoena against it. (Case No. 1:18-cv-889, Doc. 1). (As Rogers' subpoena listed both Case No. 1:18-cr-2 and Case No. 1:18-cv-889, PNC apparently filed its motion in the latter. Technically, though, that case was opened purely for statistical tracking purposes, and PNC should have filed its motion to quash in Case No. 1:18-cr-2.)

While PNC's motion to quash was pending, Rogers also filed a "Motion for Show Cause" in the criminal case. (Doc. 81). She argued that she had presented evidence that the $4,000,000 debt never existed, and that then-United States Attorney Ben Glassman conceded as much, so the "$4 million restitution order is illegal and unjust." (*Id.* at #512–13). She therefore asked the Court to order the government to show cause "why [her] request for Summary Judgment … should not be granted by producing" various documents and to grant summary judgment in her favor if production did not occur. (*Id.* at #511–14).

At that point, the criminal case (1:08-cr-2) and the case in which PNC filed its motion to quash the subpoena (1:18-cv-889) were both reassigned to Judge Dlott, who was already the judge in Rogers' civil action against PNC (1:18-cv-825). (Doc. 82; Case No. 1:18-cv-889, Doc. 2). With all three cases now before Judge Dlott, then-Chief

Judge Sargus ordered that the previous order quashing the subpoena to the United States Probation Office be held in abeyance pending Judge Dlott's ruling on Rogers' motion to vacate the criminal judgment. (Doc. 89). In response, Rogers filed a motion for contempt against the United States Attorney's Office for failing to comply with her subpoena on the criminal case docket. (Doc. 90).

Judge Dlott then issued Orders addressing all the pending motions in all three cases on the same day. In the underlying criminal case, she denied Rogers' three pending motions: the Motion to Vacate, the Motion to Show Cause, and the Motion for Contempt. (Doc. 91). In case number 1:18-cv-825, she denied Rogers' Motion for Temporary Restraining Order and Preliminary Injunction and granted PNC's Motion to Dismiss. (Case No. 1:18-cv-825, Doc. 20). And in case number 1:18-cv-889, she granted PNC's motion to quash Rogers' subpoena. (Case No. 1:18-cv-889, Doc. 4).

Unhappy with this result, Rogers moved in her criminal case for a writ of coram nobis, (Doc. 92), and sought a stay of her restitution payment obligations, (Doc. 93). Judge Dlott denied both motions. (*See generally* Doc. 94). She also denied Rogers' subsequently filed Motion for Reconsideration Pursuant to Rule 59 (Doc. 99). (*See generally* Doc. 100). So Rogers again sought a writ of coram nobis, (Doc. 105), which Judge Dlott similarly denied, (Doc. 106).

In September 2023, Rogers raised concerns (discussed below) about Judge Dlott's impartiality, (Doc. 107, #840–41), which caused Judge Dlott to recuse herself from all three cases during a two-week period. These recusals resulted in the cases'

being reassigned to the undersigned.[5] In the short window between Judge Dlott's recusal in the criminal case and her recusal in the civil cases, Rogers submitted a motion styled as a Petition for Writ of Mandamus, which was filed in each case, and in which she requested vacatur of Judge Dlott's previous Orders pursuant to 28 U.S.C. § 1651 and/or Federal Rule of Civil Procedure 60(b)(6). (Doc. 109, #845; Case No. 1:18-cv-825, Doc. 22, #139; Case No. 1:18-cv-889, Doc. 5, #29).

Rogers advances four arguments in her Petition.[6] First, she says Judge Dlott violated 28 U.S.C. § 455—the statute governing recusal—because (1) she declared herself "part of law enforcement" in another case; (2) Rogers consulted, but did not hire, Judge Dlott's husband Stanley Chesley as her attorney and, "[d]ue to the proximity of a husband and wife, it is reasonable to assume that the [sic] Dlott and Chesley discussed" the case; and (3) Chesley's loss of attorney's fees from not representing Rogers constitutes a disqualifying pecuniary interest for Judge Dlott. (Doc. 109, #846–48). Second, she says Judge Dlott falsely accused her of being connected to fake debts created by PNC Bank, and that Judge Dlott ignored a finding from the Office of the Comptroller of the Currency (OCC) that there was never any $4,000,000 debt. (*Id.* at #849–51). Third, she says Judge Dlott—driven by personal politics—improperly ignored her allegations that the FBI agent assigned to her case

---

[5] The criminal case was transferred to the undersigned on September 18, 2023. (*See* Doc. 108). The two civil cases were transferred to the undersigned on September 29, 2023. (*See* Case No. 1:18-cv-825, Doc. 23; Case No. 1:18-cv-889, Doc. 6).

[6] Because the contents of the Petition filed in each case are identical, the Court cites only to the Petition filed in the criminal matter (1:08-cr-2). As discussed below, however, the Court treats the filings in the civil cases somewhat differently from the filing in the criminal case, as different rules of procedure apply.

8

fabricated the $4,000,000 debt as part of his personal agenda to take down Former Speaker of the House John Boehner. (*Id.* at #851–52). And fourth, she says Judge Dlott referred to Orlando Carter—a party in another criminal case arising from these same facts—as a "psychopath," and that Judge Dlott "randomly, capriciously, arbitrarily and wrongfully blends, conflates and commingles" the two by referring to Carter as Rogers' "co-conspirator," (*id.* at #852–53), notwithstanding that, as noted above, "co-conspirator" is also how Rogers referred to Carter in her Plea Agreement.

In any event, the government has since responded to the Petition for Writ of Mandamus, (Doc. 110), and Rogers has replied, (Doc. 111). All three cases are now before this Court on Rogers' Petitions for Writs of Mandamus.

## LAW AND ANALYSIS

To begin, the Court notes that Rogers is proceeding pro se.[7] A pro se litigant's pleadings should be construed liberally and are subject to less stringent standards than formal pleadings filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir. 1985). But pro se litigants still must comply with the procedural rules that govern civil cases. *McNeil v. United States*, 508 U.S. 106, 113 (1993). And "[t]he liberal treatment of pro se pleadings does not require the lenient treatment of substantive law." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010).

---

[7] The docket in Rogers' criminal case lists counsel. But neither civil docket lists counsel, and Rogers filed her Petition for Writ of Mandamus in all three cases pro se. (Doc. 109, #855; Case No. 1:18-cv-825 Doc. 22, # 149; Case No. 1:18-cv-889 Doc. 5, #39).

As discussed more fully below, even considering Rogers' pro se status, her Petition falls short. To start, while Rogers labels the Petition as sounding in mandamus, mandamus is unavailable here. So the Court instead treats her Petition as a Rule 60(b)(6) motion (in the civil cases) and a motion sounding in coram nobis (in the criminal case). But that re-labeling ultimately does not help Rogers, as she also does not meet the standards for either form of relief. Finally, the Court also addresses two additional outstanding procedural matters.

**A.    Mandamus Relief Is Not Available To Rogers.**

Rogers styles her filing as a Petition for Writ of Mandamus. But the Court has no authority to issue a writ of mandamus against another district court. One statute, 28 U.S.C. § 1651, allows federal courts to issue writs of mandamus to other courts, but only those courts over which they have appellate jurisdiction. *United States v. Choi*, 818 F. Supp. 2d 79, 84 (D.D.C. 2011) ("Key to a court's issuance of a writ of mandamus is that it be acting in support of its *appellate* jurisdiction." (emphasis added)); *see Clyma v. Sunoco, Inc.*, 594 F.3d 777, 782 (10th Cir. 2010) ("A writ of mandamus is used only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." (cleaned up)). A second statute, 28 U.S.C. § 1361, also "confer[s] jurisdiction on the district courts to entertain suits 'in the nature of' mandamus," but that statute "is only a source of jurisdiction for district courts to exercise writs of mandamus to employees of the *Executive* branch." *Choi*, 818 F. Supp. 2d at 84. Neither statutory provision allows one district court judge to issue a writ of mandamus directed against

10

another district court judge. *Cf. id.* ("[A] federal court of appeals may not issue a writ of mandamus to another federal court of appeals[.]"). So, rather than treating Rogers' latest filing as a petition for writ of mandamus, the Court "us[es] its discretion to address substance over form." *McGlone v. Bell*, 681 F.3d 718, 728 n.2 (6th Cir. 2012); *accord Prudential Real Est. Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000) ("The label attached to a motion does not control its substance." (cleaned up)). For the reasons discussed below, the Court construes the Petition as a Federal Rule of Civil Procedure 60(b)(6) motion in each of the civil cases, and as a petition for writ of coram nobis in the criminal case. In all three cases, Rogers seeks reconsideration of certain of Judge Dlott's earlier rulings.

## B.    The Civil Cases: Rule 60(b)

On the civil side, Rogers' "Petition for Writ of Mandamus" asks this Court to grant her relief from the judgments in the civil cases because the alleged conspiracy against her renders those judgments a miscarriage of justice. (*See generally* Doc. 109). That is a Rule 60(b)(6) motion, regardless of its label. And her Petition expressly seeks relief from judgment under Federal Rule of Civil Procedure 60(b)(6), in addition to a writ of mandamus. (*Id.* at #845). So as to the two civil cases, the Court treats Rogers' "Petition for Writ of Mandamus" as seeking relief from judgment under Rule 60(b)(6).[8]

---

[8] As noted above, one of the two civil cases, Case No. 1:18-cv-889, was opened purely for statistical purposes, and no filings should have occurred in it. At this point, though, that is water under the bridge. So the Court addresses the filings on that docket, just as it addresses the filings in the other civil matter.

Courts generally interpret Rule 60(b) narrowly. The Rule allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding for [six enumerated] … reasons." Fed. R. Civ. P. 60(b). But "[a] Rule 60(b) motion is neither a substitute for, nor a supplement to, an appeal." *GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 373 (6th Cir. 2007) (collecting cases). "And the public policy favoring finality of judgments limits the availability of relief under the rule." *Id.* at 372 (cleaned up). Moreover, "[a] party seeking relief from judgment under Rule 60(b) must show that its case comes within the provisions of the Rule." *Lewis v. Alexander*, 987 F.2d 392, 396 (6th Cir. 1993). "In short, it is well-established in the Sixth Circuit that a … Rule 60(b) motion … does not allow the unhappy litigant to reargue the case." *Prows v. City of Oxford*, No. 1:22-cv-693, 2023 WL 7384684, at *5 (S.D. Ohio Nov. 8, 2023) (cleaned up).

That is particularly true for subsection 6—the portion of Rule 60(b) on which Rogers relies. (Doc. 109, #845). That catchall provision allows the Court to grant relief for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). But because "almost every conceivable ground for relief is covered under the other subsections of Rule 60(b)[,] … courts must apply Rule 60(b)(6) relief only in unusual and extreme situations where principles of equity *mandate* relief." *Blue Diamond Coal Co. v. Trs. of UMWA Combined Ben. Fund*, 249 F.3d 519, 524 (6th Cir. 2001) (cleaned up). "Even intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6). Instead, courts have relied on an applicable change in decisional law, coupled with some other special

circumstance, in order to grant Rule 60(b)(6) relief." *GenCorp*, 477 F.3d at 373 (cleaned up).

Under the narrowly confined review that Rule 60(b)(6) allows, Rogers cannot prevail. The Court starts with the two conspiracies Rogers alleges: one to falsify the $4,000,000 debt, and the other to take down Former Speaker Boehner. Next, it considers Rogers' argument that Judge Dlott should have recused herself because of her marriage to Stanley Chesley. Finally, it discusses Rogers' allegations about Judge Dlott's remarks from the bench. None provide a basis for relief.

### 1.    The False Debt Allegations

The Court starts with the allegations that PNC and Department of Justice Officials conspired to falsify a $4,000,000 debt.[9] As the government correctly notes, Rogers' argument that she is the victim of a grand conspiracy to falsify the underlying debt "is contradicted by the witness testimony and evidence adduced at the trial of [Rogers'] co-conspirator, Orlando Carter." (Doc. 110, #859). To be clear, the evidence and findings of fact to which the government refers, which occurred in other cases, are inadmissible hearsay in this case. *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, No. 1:22-cv-639, 2024 WL 205474, at *13 (S.D. Ohio Jan. 19, 2024) ("Equally inappropriate to form the basis of the factual record are citations to so-called factual findings in other cases and the related discovery materials that formed

---

[9] Rogers also seeks to vacate orders from two other cases in which Judge Dlott allegedly falsely linked her to an $8,810,805.65 debt: Cases l:19-cv-6 and l:21-cv-337. (Doc. 109, #850 n.10). But those cases are not currently assigned to the undersigned, so the Court need not address Rogers' claims about them as the undersigned lacks authority to issue any ruling with respect to those cases. *See supra* Part A.

the record of *those* cases but were not tested through discovery *here*."). That said, in terms of assessing whether Rogers has any prospect of clearing the hurdle for Rule 60(b)(6) relief, the Court notes that the government almost certainly *could* introduce that same evidence in this case in an admissible format to contradict Rogers' baseless assertions if called upon to do so. In short, the government's submission, while not evidence, does provide valuable insight into whether "principles of equity mandate relief." *Blue Diamond Coal*, 249 F.3d at 524 (cleaned up).

Rogers' reliance on the 2017 OCC Letter to undermine the evidence presented at Carter's trial and to argue that there was never any debt changes nothing.[10] The OCC Letter specifically states that it "should not be construed as [] a legal opinion of the OCC" and never even purports to find that the $4,000,000 debt did not exist. (Doc. 99, #731). All it says is that PNC Bank could not, in 2017, provide documents related to the $4,000,000 loan that allegedly occurred in 2004 (while also noting that the applicable document retention period for the loan at issue would have been ten years). (*Id.*). Indeed, when Carter made the same argument Rogers now presses using the same OCC Letter, the Sixth Circuit dismissed it out of hand because "a successor

---

[10] As part of her prior "Motion for Reconsideration Pursuant to Rule 59," Rogers included an affidavit from James Johnson, who says he was involved in the OCC investigation of the $4 million debt. (Doc. 99, #729–30). Rogers never brings that affidavit back up in her latest motion. But, in any case, it does not help her. Johnson never states how or why he was involved in the OCC investigation. And he never offers any statements disproving the existence of the debt. He merely reiterates an *absence* of evidence that the debt exists and purports to summarize more hearsay statements from parties he interviewed. That functionally restates Rogers' theory—based on the OCC Letter and most recently articulated in her Petition for Writ of Mandamus—that there is currently a lack of evidence to prove the $4 million debt, meaning that it never existed. But for the reasons discussed in this section, the OCC investigation proves no such thing.

bank's response to record requests ten years later, viewed in light of the trial evidence demonstrating the existence of the guaranty," did not disprove the existence of the debt. *In re Carter*, No. 18-3080, 2018 U.S. App. LEXIS 10743, at *3 (6th Cir. Apr. 26, 2018). *Cf. Hubbard v. Rewerts*, No. 21-2968, 2024 WL 1635181, at *8 (6th Cir. Apr. 16, 2024) ("[A] petitioner [must] show the probability of his *innocence*, rather than merely impeach the State's case. This means that a defendant must put forth some type of reliable evidence that is exonerative in nature.")

So too here. Rogers seeks to characterize a lack of record retention years after her guilty plea and PNC's purchase of National City Bank as "new evidence" that no debt ever existed. But the OCC Letter proves no such thing. And it is the only "evidence" Rogers offers as support for her allegations that PNC Bank and Department of Justice Officials falsified the $4,000,000 debt in her underlying criminal case. So she has not merited Rule 60(b)(6) relief—the entitlement to which is her burden to show, *Lewis*, 987 F.2d at 396—on that basis.

### 2. The Alleged Conspiracy Against Former Speaker Boehner

The three allegations from Rogers' verified Petition[11] about a plot to take down former Speaker of the House John Boehner also fall short. First, she contends Ohio State "Senator [George] Lang informed Rogers that FBI Agent Kevin Gormley

---

[11] Rogers signed the Petition under penalty of perjury, (*see* Doc. 109, #855), essentially making it an affidavit as to the facts asserted. *See Belser v. James*, No. 16-2578, 2017 WL 5479595, at *2 (6th Cir. June 6, 2017) ("Each of Belser's pleadings was signed under penalty of perjury, and is therefore sufficient to qualify as an affidavit for the purposes of summary judgment." (cleaned up)). And she incorporates allegations from her prior verified petition for writ of coram nobis, (Doc. 109, #851–52 (citing Doc. 105, #743)), which she also signed under penalty of perjury, (Doc. 105, #763).

('Gormley') informed him during the investigation that the government had their eyes on and 'wanted to indict Former U.S. Speaker of the House of Representatives, John Boehner' because he was the bigger fish in the matter." (Doc. 105, #743). Second, she asserts that "Senator Lang is available to testify under oath to these matters during [her] [requested] hearing." (*Id.* at #743 n.1). And third, she claims that "[f]ederal prosecutors intentionally turned a blind eye to the truth … because [they] … were politically motivated during their investigation with the end-objective of indicting Former Republican Speaker of the House of Representatives, John Boehner." (*Id.* at #743).

None of those allegations work. For starters, the only substantive basis for these allegations constitutes a statement subject to several layers of hearsay. Gormley allegedly told Lang, who allegedly told Rogers, who offered those out-of-court statements as evidence to prove the existence of a conspiracy at the time she moved for relief. Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). That uncorroborated hearsay statement does not satisfy any of the hearsay exclusions or exceptions, *see* Fed. R. Evid. 801(d), 803, 804, 807, so it is inadmissible under the Federal Rules of Evidence, Fed. R. Evid. 802. And given the several layers of hearsay are not overcome, Rogers' uncorroborated claim that Lang is willing to testify that Gormley made this statement, (Doc. 105, #743 n.1), does nothing to change this determination. Even if Lang testified in person, it would be about what Gormley

allegedly said to him—the hearsay problem remains. If Rogers contended that she had spoken to Gormley, and that he confirmed the story, that may change things—as with the evidence from other trials to which the Court referred above, it would at least suggest that she may be able to provide the testimony in an admissible form. But she has not even suggested that here.

Nor ultimately would it matter. Even if Rogers' sworn allegations were not hearsay, they would still fall short. "The presumption of regularity supports [the Attorney General's and United States Attorneys'] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (cleaned up). Rogers' uncorroborated conspiracy allegations are "simply too fantastic to be credible," *Jimenez v. City of New York*, No. 14-cv-2994, 2015 WL 5638041, at *6 (S.D.N.Y. Sept. 24, 2015), so the Court does not consider them "clear evidence" rebutting the presumption of prosecutorial regularity. And for the reason noted above, Rogers' offer to have Lang testify does not fix that. Nor does her conclusory allegation that "[f]ederal prosecutors intentionally turned a blind eye to the truth." (Doc. 105, #743). So Rogers cannot obtain Rule 60(b)(6) relief based on the alleged conspiracy against Former Speaker John Boehner, for which she was somehow collateral damage, either.

### 3. The § 455 Argument

Next, the Court turns to Rogers' argument that Judge Dlott violated § 455 by not recusing herself based on events involving her spouse. Before addressing the

17

merits of that argument, though, the Court addresses an issue that the parties did not raise: Can a second district court judge consider under Rule 60(b) an earlier judge's choice not to recuse herself under § 455?

It appears, after a review of out-of-circuit cases, that the answer may be yes. In *Holmes v. Apple, Inc.*, Case No. 22-1745, 2023 WL 6619358 (2d Cir. Oct. 11, 2023), the appeals court addressed just such a procedural setting. In doing so, it reviewed the merits of the second judge's decision on the recusal question, which had been raised in the district court through a Rule 60(b) motion, *id.* at *1, without suggesting that there was anything untoward about the procedure, *id.* at *2. This Court has found no contrary precedent. So it concludes that it can consider the issue here.

That said, Rogers' argument fails for three reasons. First, as the government correctly points out, (Doc. 110, #857–58), the argument is not timely. Second, it lacks merit. And finally, even putting all that aside, any error surrounding recusal would be harmless.

On the timeliness front, although Rogers never states when she consulted Chesley, it must have been more than 10 years ago, as Chesley has not practiced law since 2013. *See*, *e.g.*, *In re Chesley*, No. D-2731, 571 U.S. 1021 (Nov. 18, 2013) (mem) (accepting Chesley's resignation as a member of the United States Supreme Court Bar). And Judge Dlott was assigned to Rogers' criminal case—the first of the Rogers cases assigned to her—in April 2019. (Doc. 82). So Rogers knew the relevant facts— that (1) she had consulted Chesley, (2) Chesley was married to Judge Dlott, and (3) Judge Dlott was presiding over her case—for several years before she filed her

18

recusal challenge in September 2023. Yet she waited until Judge Dlott ruled against her to argue that Judge Dlott should have recused under § 455.

Parties may not hedge their bets by waiting to see how a judge will rule before arguing for recusal. *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997) ("The policy considerations supporting a timeliness requirement are the same in [§ 455(a) and § 455(b)]: to conserve judicial resources and [to] prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge."). So giving Rogers another bite at the apple is unwarranted here. After all, as the Sixth Circuit observed in another context, "the leniency granted to pro se petitioners … is not boundless." *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (cleaned up).

Rogers resists this conclusion by citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), to argue that § 455 can apply retroactively via Rule 60(b), even when a party files a tardy § 455 motion. (Doc. 111, #863–64). That is broadly true, *Liljeberg*, 486 U.S. at 861–64, but the citation is inapt on the facts here. The *Liljeberg* court wrote that "although a delay of 10 months … would normally foreclose relief[,] … the entire delay [was] attributable to Judge Collins' inexcusable failure to disqualify himself [promptly] … or even [to] disclose[][the] interest [of the university of which he was a trustee]" in the case. *Id.* at 869. Here, by contrast, it was Rogers herself who was solely responsible for the delay because she strategically withheld her § 455 argument until long after she knew all the relevant facts, and the delay was *years*, not merely ten months. The Court will not indulge such gamesmanship.

19

Second, even setting aside the timeliness issues, Rogers' allegations based on Judge Dlott's relationship to Chesley are conclusory and unpersuasive. Under *Liljeberg*, in assessing recusal under § 455, courts employ a three-part test, under which they consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864.

Here, none of those factors favor recusal. Contrary to Rogers' assertion to this effect, (Doc. 109, #848), it simply does not follow from Rogers' consulting Chesley and Chesley's being married to Judge Dlott that Chesley and Judge Dlott must have flouted their ethical obligations by discussing Rogers' case when it was assigned to her many years later. Nor does it follow that the unspecified attorney's fees Chesley would have obtained had he represented Rogers mean Judge Dlott holds a "direct, personal, substantial pecuniary interest in" the outcome of Rogers' case, *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), as Rogers claims, (Doc. 109, #848). And absent any objective indicia of bias, judges are entitled to a "presumption of impartiality." *Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013) ("The presumption of impartiality stems not merely from the judicial-bias caselaw, but from the more generally applicable presumption that judges know the law and apply it in making their decisions, and the even more generally applicable presumption of regularity." (citations omitted)). So Rogers' "bald allegations of bias or prejudice are insufficient" to support disqualification. *Jordan v. U.S. Dep't of Just.*, 315 F. Supp. 3d 584, 591 (D.D.C. 2018) (cleaned up). In short, Rogers' allegations provide no reasonable basis to conclude

20

that she suffered any injustice in her case, or that a failure to recuse would cause any injustice in any other case. Nor are the allegations here of the type that would give rise to legitimate concerns on the part of the public about Judge Dlott's impartiality. The § 455 argument therefore also fails on the merits.

Finally, even if Rogers did not fail on both the timeliness and merits of her argument (as noted, she clearly does so fail), the alleged "recusal error, if any occurred, was harmless." *Smith v. ABN AMRO Mortg. Grp. Inc.*, 434 F. App'x 454, 466 (6th Cir. 2011). Although courts "apply the harmless-error doctrine with great caution," it is appropriate when the contested decisions merely reach an "inescapable legal conclusion." *Id.* As discussed above, Rogers' conviction was based on facts she admitted in her plea agreement, was fully consistent with the jury's verdict in her co-conspirator's case, and is further confirmed by the Sixth Circuit's rejection of her co-conspirator's so-called 'new evidence,' which is the same 'evidence' on which she relies here. That context compels the "inescapable legal conclusion," *id.*, that Rogers' conviction is valid. So any supposed error in recusal here, if there was one (again, there was not), was harmless. Accordingly, Rogers' arguments based on Judge Dlott's alleged bias on this score provide no basis for Rule 60(b)(6) relief.

### 4. Remarks from the Bench

That leaves Rogers' allegations that Judge Dlott called Carter a psychopath from the bench and declared herself a "part of law enforcement." (Doc. 109, #847–48, 852–53). The Court cannot find any statement that could plausibly be interpreted as Judge Dlott's declaring herself "part of law enforcement," nor does Rogers identify

when or where Judge Dlott allegedly made such a statement. So the Court considers only Judge Dlott's comment that included the term "psychopath." The Court did in fact locate that comment, (*see* Case No. 1:21-cv-337, Doc. 104, #937 ("Mr. Carter, if I could, I would order a mental exam for you because I think you're a psychopath.")), but that assertion offers no basis for relief.

The standard for whether judicial comments establish bias is high. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994). They only support such a motion if they either rely on an extrajudicial source of bias or "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*; *Balkany v. United States*, 751 F. App'x 104, 108 (2d Cir. 2018) (holding that calling the defendant an "extortionist" "outside the presence of the jury during a colloquy with defense counsel … constitute[d] an opinion 'formed by the judge on the basis of facts introduced' and, by itself, d[id] not reveal a 'deep-seated … antagonism' to [the defendant]"). And "expressions of impatience, dissatisfaction, [and] annoyance … that are within the bounds of what imperfect men and women … sometimes display" do not establish bias or partiality. *Liteky,* 510 U.S. at 555–56.

The referenced comment from Judge Dlott regarding Carter occurred during a show cause hearing, not in the presence of a jury. It also appears to be based on facts introduced during Carter's trial and his subsequent filing of a dozen frivolous lawsuits over the same meritless issue about the purportedly fabricated $4 million

loan, (Case No. 1:21-cv-337, Doc. 104, #936 (noting before the referenced comment that Carter had "filed 12 lawsuits in this court that are all meaningless")), not an impermissible, extraneous source of information. And even a cursory review of the transcript provides plenty of reasons why Judge Dlott would have been understandably "impatien[t]" and "annoy[ed]" with Carter, *Liteky,* 510 U.S. at 555, in the period leading up to that exchange.

Separately, Judge Dlott never described *Rogers* as a psychopath—only Carter. So even if her comment displayed a "deep-seated favoritism or antagonism" toward Carter, an issue the Court does not decide, it would not suffice to show judicial bias against Rogers.

True, Rogers claims that Judge Dlott's views toward Carter should also be understood as extending to Rogers, as Judge Dlott has allegedly "wrongfully blend[ed], conflate[d] and commingle[d]" the two (as allegedly evidenced by Judge Dlott referring to Carter as Rogers' "co-conspirator"). (Doc. 109, #853). But Rogers herself has also referred to Carter as a "co-conspirator[]," (*see* Doc. 2, #19), so the Court ascribes little significance to that label. And merely noting that one co-conspirator may have psychopathic tendencies does not suggest that all co-conspirators do. Accordingly, Rogers' final basis for Rule 60(b)(6) relief also falls flat.

In short, none of Rogers' allegations convince the Court that "principles of equity *mandate* relief" in her case. *Blue Diamond Coal*, 249 F.3d at 524 (citation omitted). So the Court will not grant her relief under Federal Rule of Civil Procedure 60(b)(6) in either of her civil cases.

23

**C.    Rogers Does Not Succeed on Her Request for Coram Nobis in Her Criminal Case.**

Turning to the underlying criminal case, the Court cannot construe Rogers' Petition as anything but a petition for writ of coram nobis because no other relief is available. Federal Rule of Civil Procedure 60(b) is inapplicable because Rogers is attacking part of the underlying criminal judgment—her restitution obligations. *United States v. Gibson*, 424 F. App'x 461, 464 (6th Cir. 2011) ("Unlike habeas proceedings … federal criminal trials are governed by the Federal Rules of Criminal Procedure. … Accordingly, Rule 60(b) … may not be used to disturb a criminal sentence or conviction … [and] does not provide relief from judgment in criminal proceedings." (cleaned up)). And 28 U.S.C. § 2255 is not viable, either. True, when a person in custody files a motion attacking the resolution of a previous § 2255 motion and/or raising new grounds for relief, that filing is considered a § 2255 motion. *In re Nailor*, 487 F.3d 1018, 1023 (6th Cir. 2007) ("[T]o the extent that Nailor's Rule 60(b)(6) motion attacks the district court's previous resolution of a claim on the merits [in ruling on his previous § 2255 motion], we consider the motion a § 2255 motion. Alternatively, Nailor's Rule 60(b)(6) motion could be read to raise a new claim for relief[, which is also properly considered] … a § 2255 motion[.]"). But having long since completed both her period of incarceration and her period of supervised release, *see United States v. Woods*, No. 97-3866, 145 F.3d 1335, 1998 WL 228038, at *1 (6th Cir. 1998) (table) ("One serving out a period of supervised release is 'in custody' for purposes of § 2255."), Rogers is no longer in custody. And "a person who is no longer in custody … cannot seek habeas relief under 28 U.S.C. § 2255," *United States v.*

24

*Castano*, 906 F.3d 458, 462 (6th Cir. 2018) (cleaned up), even if she is still subject to restitution obligations, *Kaminski v. United States*, 339 F.3d 84, 88 (2d Cir. 2003) ("Nearly every circuit to consider the issue has concluded that an order of restitution may not be attacked in a § 2255 petition, even if the petition also alleges error in the sentence of imprisonment."); *see also United States v. Fabian*, 798 F. Supp. 2d 647, 684–85 (D. Md. 2011) ("[A] noncustodial component of a sentence, such as a restitution or forfeiture order, cannot be attacked in a § 2255 petition.").

That leaves one last avenue for Rogers to attack her criminal conviction: a writ of coram nobis. Federal courts have the authority to grant writs of coram nobis under the All Writs Act. *United States v. Denedo*, 556 U.S. 904, 911 (2009). And "[a] criminal defendant may seek a writ of coram nobis to set aside an erroneous conviction," *United States v. Singh*, 95 F.4th 1028, 1032 (6th Cir. 2024), which as described below includes setting aside an erroneous conviction giving rise to ongoing restitution obligations. "But the writ is an 'extraordinary remedy' used only to correct errors 'of the most fundamental character.'" *Id.* (citation omitted). To obtain a writ of coram nobis, a petitioner must establish four elements: (1) an error during the proceedings that casts doubt on the validity of the conviction; (2) "no alternative remedy to correct the error"; (3) "good reasons for not seeking to correct the error earlier"; and (4) "an ongoing civil disability" caused by the conviction. *Id.* As to the second, coram nobis "is only available when relief under 28 U.S.C. § 2255 is unavailable—generally, when the petitioner … is no longer in custody as required for § 2255 relief." *United States v. Henton*, No. 19-1872, 2020 WL 4558842, at *1 (6th Cir. Mar. 10, 2020). And a

25

disability that satisfies the fourth prong must (1) "be causing a present harm" that is not "purely speculative," (2) "arise out of the erroneous conviction," and (3) "be more than incidental." *Castano*, 906 F.3d at 463 (cleaned up).

In applying the four-part coram nobis test, "[i]t is presumed that the proceedings leading to the prior conviction were correct, and the burden rests on the accused to show otherwise. The petitioner must also demonstrate that correction of the error probably would have altered the outcome of the challenged proceeding." *Id.* at 462 (cleaned up). And "the ultimate question of *coram nobis* … is[] whether granting the writ is necessary to achieve justice." *Id.* at 464.

Rogers satisfies two of the four elements necessary for coram nobis. She has "no alternative remedy to correct the [alleged] error," *Singh*, 95 F.4th at 1032, as she is not in custody and thus cannot bring a § 2255 motion. And she has "an ongoing civil disability" in the form of her restitution obligations. *Id.*

But she struggles with the other two. On the first prong, the only evidence that even arguably "casts a doubt" on the underlying conviction is Rogers' argument that the $4 million loan never really occurred. Evidence about Judge Dlott's alleged bias, by contrast, has nothing to do with the original conviction, as Judge Dlott did not handle any aspect of the criminal matter in connection with that conviction. But, as to the loan, for all the reasons discussed above, Rogers' claim that she has "new evidence" that it never occurred is simply spurious. So she cannot meet the first prong of the coram nobis analysis. And because the petitioner must establish all four elements, that failure by itself is enough to deny Rogers the relief she seeks.

26

Beyond that, though, Rogers likewise cannot meet the third prong of the coram nobis standard—"good reasons for not seeking to correct the error earlier." *Id.* She has known, or should have known, the facts that serve as the basis for her latest arguments for years. *Pickett v. United States*, No. 18-cv-2560, 2018 WL 9990828, at *2 (E.D.N.Y. Nov. 1, 2018) ("The critical inquiry is whether the petitioner knew or should have known earlier of facts underlying his claim for *coram nobis* relief." (cleaned up)). Yet, she never offers any reasons, let alone good reasons, why she could not have raised them earlier.

Start with the "fake debt" argument. The OCC Letter on which Rogers now relies to argue that the underlying debt in her case is fake is dated January 30, 2017. (Doc. 99, #731). And she made the same argument she now makes, based on the same letter, in a motion she filed on February 28, 2020. (Doc. 99). So not only should she have known the facts underlying this claim since 2017, but she has indisputably known them since at least February 2020.

As for the arguments relating to alleged bias, as noted above, they do nothing to attack the conviction. But even if they did, they are likewise not timely. For example, Rogers knew, or definitely should have known, that Judge Dlott was married to Chesley and that Judge Dlott was presiding over her case since April 2019, when Judge Dlott was assigned to preside, (*see* Doc. 82). But Rogers did not raise the alleged bias issue until she filed the motion currently before the Court on September 27, 2023—more than four years later. (*See* Doc. 109). That delay, along with her lack of an explanation excusing her tardiness, dooms her request for relief.

27

So based on *both* the merits and timeliness issues, Rogers' request for coram nobis relief fails.

## D. Additional Procedural Issues

Last, the Court addresses two outstanding procedural issues related to the Petition. First, a hearing will not—indeed could not—fix any of the shortcomings inherent in Rogers' arguments. So the Court denies Rogers' request for a hearing, (Doc. 109, #854–55), as moot in light of the Court's decision on the Petition.

Second, Rogers asks the Court to stay its September 19, 2023, Notation Order, which gave her until September 29, 2023, to file a motion for reconsideration. (*Id.* at #845 n.2). But she filed her Petition for Writ of Mandamus on September 27, 2023. And, as discussed above, the Petition is really a combined petition for writ of coram nobis and Rule 60(b)(6) motion—in other words, a motion for reconsideration. So Rogers has already filed a motion for reconsideration within the allowable timeline set by the Court's Notation Order. Moreover, her latest motion for reconsideration follows her previous 28 U.S.C. § 2255 motion, her two previous petitions for writs of coram nobis, and her previous motion for reconsideration. (Docs. 73, 92, 99, 105). The Court therefore denies Rogers' request to stay the September 19, 2023, Notation Order to allow her to file yet another motion for reconsideration. "[Rogers] may be correct that the Court erred. But h[er] remedy for any such error lies in appeal, not further attempts to litigate here." *Prows*, 2023 WL 7384684, at *5.

## CONCLUSION

For the above reasons, the Court **DENIES** Rogers' Petitions for Writs of Mandamus (Doc. 109; Case No. 1:18-cv-825, Doc. 22; Case No. 1:18-cv-889, Doc. 5).

Finally, the Court takes this opportunity to address Rogers' litigation history. For the last eight years, Rogers' co-conspirator Orlando Carter and entities controlled by Carter have filed various meritless actions—now dismissed[12]—advancing the same fantastical allegations that Rogers presses in her latest motion. Rogers is clearly aware of Carter's litigation, as the 2017 OCC letter on which she relies is addressed to Carter. (Doc. 99, #731). So she is, or ought to be, aware that the arguments she is pressing have been consistently and roundly rejected as divorced from reality. Yet despite that knowledge, she herself has likewise filed several patently meritless, duplicative motions in the three cases before this Court: a 28 U.S.C. § 2255 motion, three petitions for writ of coram nobis, a Rule 59 motion for reconsideration, and two Rule 60(b) motions.

Rogers' litigation history suggests a willingness to engage in vexatious and harassing behavior, which inappropriately diverts scarce judicial resources to

---

[12] *Carter v. United States*, Case No. 1:16-cv-530 (Doc. 23, #305–06 ("Because this Court is granting a dispositive motion, and amendment would be futile, this Court need not consider the remaining motions[. But] … Plaintiff is hereby advised and cautioned that a cause of action to obtain documents under the Freedom of Information Act is not the vehicle through which a party may … challeng[e] an earlier criminal conviction.")); *Carter v. United States*, Case No. 1:17-cv-248 (Doc. 48); *Carter v. Nat'l City Bank*, Case No. 1:17-cv-508 (Doc. 67); *CBST Acquisition LLC v. United States*, Case No. 1:18-cv-162 (Doc. 41); *Carter v. Furmon*, Case No. 1:18-cv-400 (Doc. 40); *Carter v. PNC Bank, N.A.*, Case No. 1:18-cv-706 (Doc. 39); *Carter v. PNC Financial Services Group, Inc*., Case No. 3:18-cv-283 (Doc. 9 (dismissing bankruptcy court appeal for want of prosecution)); *TD Investments LLC v. National City Bank*, Case No. 1:21-cv-337 (Docs. 71 (dismissing plaintiff TD Investments' amended complaint), 105 (holding in contempt and sanctioning TD Investments, its CEO, its counsel, Carter, and Carter's majority-owned company CBST Acquisitions)).

disposing of her meritless filings. Should Rogers opt to file any further frivolous lawsuits or motions involving her criminal conviction and related proceedings, the Court warns Rogers that the Court will exercise its inherent authority to impose sanctions on her, up to and including a declaration that she is a vexatious litigant, the imposition of pre-filing requirements, fines, and any other sanction deemed necessary to protect against further abuse of the judicial process.

**SO ORDERED.**

May 7, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**